**FILED**

DEC 1 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL JAMES KLOPF, #26218-004
F.C.I.
P.O. 1000
    Plaintiff,
    Loretto, PA. 15940

v.

FEDERAL BUREAU OF PRISONS,

    Defendant.

_____/

CIVIL ACTION NO. _____

Case: 1:07-cv-02246
Assigned To : Lamberth, Royce C.
Assign. Date : 12/13/2007
Description: Pro Se General Civil

## COMPLAINT

This is a civil action brought by MICHAEL JAMES KLOPF, a federal prisoner proceeding <u>pro se</u>, for declaratory and injunctive relief. Equity provides the basis for this claim. This Court has jurisdiction under 28 U.S.C. § 1331.

Plaintiff alleges that Defendant was, and continues to be, deliberately indifferent to his serious medical condition in violation of the Eighth Amendment's proscription against cruel and unusual punishment.

### Facts

**1.** Plaintiff is incarcerated at the Federal Correctional Institution in Loretto, Pennsylvania (FCI Loretto).

**2.** Plaintiff has a projected release date of July 5th, 2018.

**3.** Plaintiff has been in continuous federal custody since February 14th, 2003.

**4.** Plaintiff is 48 years old.

1

5. Plaintiff has not filed any previous lawsuits concerning this claim.

6. Plaintiff is infected with the Hepatitis C virus.

7. As a direct result of this virus, Plaintiff suffers from cirrhosis of the liver, gallstones, a low platelet count, a low white blood cell count, a high bilirubin level, diabetes, high blood pressure, an umbilical hernia, constant nausea, acid reflux, and chronic fatigue.

8. Plaintiff underwent pegylated interferon therapy in 2005 at the Federal Medical Center in Rochester, Minnesota (FMC Rochester).

9. Pegylated interferon therapy involves weekly synthetic protein injections for six months to two years at a cost of approximately $2,000 per month.

10. The goal of pegylated interferon therapy is to put the Hepatitis C virus into remission so that it stops destroying the cells of the liver. This is known as a sustained virological response.

11. Plaintiff's primary care physician at FMC Rochester was Dr. Ronald E. Ilvedson.

12. Dr. Ilvedson was/is an employee of the Federal Bureau of Prisons.

13.  Before undergoing pegylated interferon therapy, Plaintiff was referred by Dr. Ilvedson to gastroenterologists (GIs) from the Mayo Clinic to determine the correct regimen of treatment to be administered.

14.  The Mayo Clinic GIs (Roman E. Perri, M.D., and John B. Gross, Jr., M.D.) recommended that full doses of pegylated interferon (180 mcg. of alpha-2a) be administered to Plaintiff for a period of 48 weeks.

15.  The GIs also recommended close monitoring of Plaintiff's platelet count during treatment. A platelet count essentially refers to the thickness of a person's blood. The lower the platelet count, the thinner the blood is, thus impeding its ability to clot.

16.  Individuals with cirrhosis of the liver generally have a low platelet count because the body instinctively thins its own blood so that it can more easily pass through the scarred liver.

17.  The GIs advised that if Plaintiff's platelet count drops below 40,000, the interferon dose should be reduced by one third. And if it drops below 20,000, treatment should be discontinued because of the possibility of spontaneous internal bleeding.

18.  Plaintiff began treatment with a platelet count of 63,000. At no time during treatment did Plaintiff's platelet count drop below 48,000.

19.   The GIs stressed how important it is for full doses of interferon to be administered to the Plaintiff in order to achieve a sustained virological response so that his liver has a legitimate chance to heal.

20.   It is quite commom for patients undergoing interferon therapy to suffer from serious side effects which prevents them from completing their treatment regimens and/or hinders their ability to withstand full doses of interferon.

21.   At no time during treatment did Plaintiff experience negative side effects of any kind.

22.   Plaintiff has a Genotype 3 of Hepatitis C infection.

23.   Although a Genotype 3 infection is associated with a high viral load, a patient with a Genotype 3 infection has the best opportunity for treatment success.  There is a 70-80% chance of clearing the virus after 48 weeks of pegylated interferon treatment.

24.   A viral load is the amount of the Hepatitis C virus in a specific volume of blood.

25.   According to the American Liver Foundation, a high viral load is in the range of 5-25 million.  25 million and up is considered a very high viral load.

26.   Before a patient undergoes interferon therapy, a viral load test is administered to ascertain the patient's specific viral load (the baseline level).

27. After 24 weeks of treatment (the halfway point), another viral load test is administered to ascertain the patient's response to the interferon.

28. Pursuant to commonly accepted treatment principles, a two log supression from the baseline level is required in order for the patient to continue with the interferon treatment.

29. A two log suppression results in a viral load that is equal to, or less than, one percent of the baseline level (i.e., a two log suppression from a baseline level of 10,000,000 results in a viral load of 100,000).

30. Although full doses of pegylated interferon were recommended by the Mayo Clinic GIs, the Defendant administered only half doses (90 mcg. of alpha-2a) to the Plaintiff. This resulted in a considerable cost savings for the Defendant.

31. This decision was made by Michael B. Nelson, D.O., Chief of Health Programs, Federal Bureau of Prisons, 320 First Street, N.W., Washington, D.C., 20534.

32. Dr. Nelson was/is an employee of the Federal Bureau of Prisons.

33. After 24 weeks of treatment, a viral load test was administered to the Plaintiff to ascertain his response to the interferon.

34. The result showed a viral load suppression to 65,830.

35. When searching for Plaintiff's pre-treatment viral load test result to determine if Plaintiff's suppression level amounted to a two log decrease from his baseline level, Dr. Ilvedson could not locate it in the Plaintiff's file.

36. Dr. Ilvedson contacted the lab to obtain a copy of Plaintiff's pre-treatment test result.

37. The lab informed Dr. Ilvedson that he failed to order a pre-treatment viral load test for the Plaintiff.

38. Consequently, Dr. Ilvedson had nothing to compare the Plaintiff's current viral load with to determine if the interferon was working effectively.

39. Dr. Ilvedson, however, found an old viral load test result in the Plaintiff's file from January of 2004 (more than 1½ years earlier) that was administered when the Plaintiff was incarcerated at the Federal Detention Center in Miami, Florida.

40. The problem with this test result is: The lab that quantified it did **not** ascertain Plaintiff's specific viral load. The test result simply said Plaintiff's viral load was "greater than 700,000."

41. In his haste to cover-up his error, Dr. Ilvedson used this old, non-specific test result as a substitute for the pre-treatment viral load test that he failed to order for the Plaintiff.

42. Dr. Ilvedson then determined that because Plaintiff's baseline viral load has never been properly ascertained, "We must assume that it was 700,000."

43. This assumption was based on neither science nor medicine.

44. Because Dr. Ilvedson "assumed" that Plaintiff's baseline viral load was 700,000, he concluded that the interferon treatment was not working.

45. If 700,000 were indeed the true starting point, a decrease to 65,830 is not a two log suppression from the baseline level (Plaintiff's viral load would have had to decrease to 7,000).

46. However, based on Plaintiff's Genotype 3 virus, his baseline viral load was substantially greater than 700,000. Most likely, it was more than 20 times greater. Unfortunately, at this point, it is impossible to determine what the Plaintiff's baseline level was because Dr. Ilvedson failed to order his pre-treatment viral load test.

47. Plaintiff explained to Dr. Ilvedson that, contrary to his conclusion, Plaintiff was responding to the interferon treatment in an overwhelmingly positive manner considering **(A)** the probability of an extreme baseline level because of Plaintiff's Genotype 3 virus, **(B)** the decrease of Plaintiff's viral load to 65,830, and **(C)** the fact that this decrease was accomplished with just half doses of pegylated interferon.

48.    Nevertheless,   Dr.   Ilvedson   decided   to   discontinue Plaintiff's interferon treatment (again at a considerable cost savings for the Defendant).

49.   Plaintiff pleaded with Dr. Ilvedson to at least allow him to consult with the Mayo Clinic GIs to obtain a qualified opinion before discontinuing treatment.

50.   Dr.  Ilvedson  refused  this  request  for  a  consultation, commenting  that  Plaintiff  "[was]  lucky  to  get  any  kind  of treatment to begin with."

51.   Plaintiff's   interferon   treatment   was   discontinued   on September 14th, 2005.

52.   On   the   same   day,   Plaintiff   filed   a   REQUEST   FOR ADMINISTRATIVE REMEDY (See Exhibit A).

53.   This  request  was  denied  by  Warden  Marty  C.  Anderson  on October  7th,  2005  (See  also  Exhibit  A).    Warden  Anderson improvised that Plaintiff's platelet count also played a part in the decision to discontinue treatment.

54.   Warden  Anderson  was/is  an  employee  of  the  Federal  Bureau of Prisons.

55.   On   October   21st,   2005,   Plaintiff   filed   a   REGIONAL ADMINISTRATIVE REMEDY APPEAL (See Exhibit B).

56. On November 8th, 2005, Plaintiff was transferred to FCI Loretto. With the stroke of a pen, Dr. Ilvedson cleared the Plaintiff for a routine transfer as if his serious medical condition were miraculously cured.

57. Plaintiff's REGIONAL ADMINISTRATIVE REMEDY APPEAL was denied by Regional Director Michael K. Nalley, North Central Regional Office, Federal Bureau of Prisons, 4th & State Avenues, 8th Floor, Kansas City, KS, 66101, on November 18th, 2005 (See also Exhibit B).

58. Regional Director Nalley was/is an employee of the Federal Bureau of Prisons.

59. On December 14th, 2005, Plaintiff filed a CENTRAL OFFICE ADMINISTRATIVE REMEDY APPEAL (See Exhibit C).

60. This appeal was denied by Administrator Harrell Watts, Office of General Counsel, Federal Bureau of Prisons, 320 First Street, N.W., Washington, D.C., 20534, on February 24th, 2006 (See also Exhibit C).

61. Administrator Watts was/is an employee of the Federal Bureau of Prisons.

62. Plaintiff has completely exhausted his administrative remedies within the Federal Bureau of Prisons.

63. Plaintiff is at the very last stage of Hepatitis C infection (compensated cirrhosis) where interferon can be administered.

64. Once Plaintiff's liver decompensates, his body will no longer be able to sustain itself and severe side effects will occur (jaundice, ascites, bleeding esophageal varices, hepatic encephalopathy, cancerous tumors in the liver, etc.).

65. At this point, a liver transplant will be the Plaintiff's only hope for survival.

66. The Federal Bureau of Prisons, however, does not provide inmates with liver transplants.

67. If Plaintiff does not soon undergo full and carefully monitored pegylated interferon treatment as originally recommended by the Mayo Clinic GIs (commensurate with prevailing community medical standards), it essentially amounts to a death sentence.

68. Even if Plaintiff does not achieve a sustained virological response after a full course of treatment with full doses of pegylated interferon, maintenance therapy (half doses of pegylated interferon for a prolonged or indefinite period) has already proven to be effective for the Plaintiff.

69. The goal of maintenance therapy is to stop or significantly slow the progression of cirrhosis caused by the Hepatitis C virus until new and better drugs are developed.

70. Two studies, known as Hepatitis C Antiviral Long-term Treatment against Cirrhosis (HALT-C), sponsored by the National Institutes of Health, and Colchecine versus Peg-Intron Long-Term (COPILOT), sponsored by Schering-Plough Pharmaceuticals, have recently confirmed that long-term, low-dose treatment with pegylated interferon (maintenance therapy) reduces the risk of hepatic decompensation, liver cancer, liver transplantation, and death in cirrhotic patients.

## Claims for Relief

### Count I

71. The refusal of Defendant to provide Plaintiff with full doses of pegylated interferon, as originally prescribed in the expert recommendation of the Mayo Clinic GIs, amounts to deliberate indifference to Plaintiff's serious medical condition in violation of the Eighth Amendment's proscription against cruel and unusual punishment.

72. As a result of Defendant's deliberate indifference to Plaintiff's serious medical condition, Plaintiff suffered, and continues to suffer, great pain of body and mind.

73. In support of this claim, Paragraphs 1-70 are fully incorporated by reference herein.

**Count II**

74.  The failure of Defendant to routinely order a pre-treatment viral load test for the Plaintiff, then to utilize a different, non-specific test result as an improper substitute, and ultimately to base a life or death decision to discontinue Plaintiff's interferon treatment on guesswork relating to this improper substitute test result, amounts to deliberate indifference to Plaintiff's serious medical condition in violation of the Eighth Amendment's proscription against cruel and unusual punishment.

75.  As a result of Defendant's deliberate indifference to Plaintiff's serious medical condition, Plaintiff suffered, and continues to suffer, great pain of body and mind.

76.  In support of this claim, Paragraphs 1-70 are fully incorporated by reference herein.

**Count III**

77.  The refusal of Defendant to allow Plaintiff to consult with the Mayo Clinic GIs to obtain an expert opinion before discontinuing Plaintiff's interferon treatment, and transferring Plaintiff to another institution to intentionally keep him far away from these GIs who would definitively support Plaintiff's position, amounts to deliberate indifference to Plaintiff's serious medical condition in violation of the Eighth Amendment's proscription against cruel and unusual punishment.

78. As a result of Defendant's deliberate indifference to Plaintiff's serious medical condition, Plaintiff suffered, and continues to suffer, great pain of body and mind.

79. In support of this claim, Paragraphs 1-70 are fully incorporated by reference herein.

**Count IV**

80. The continued refusal of Defendant to re-treat Plaintiff with pegylated interferon for the Hepatitis C virus, or to allow him to consult with **any** hepatologist or other liver specialist who would certainly recommend that Plaintiff be re-treated, amounts to deliberate indifference to Plaintiff's serious medical condition in violation of the Eighth Amendment's proscription against cruel and unusual punishment.

81. As a result of Defendant's deliberate indifference to Plaintiff's serious medical condition, Plaintiff suffered, and continues to suffer, great pain of body and mind.

82. In support of this claim, Paragraphs 1-70 are fully incorporated by reference herein.

### Relief Requested

**WHEREFORE,** Plaintiff MICHAEL JAMES KLOPF requests this Honorable Court to grant the following relief:

1. Issue a declaratory judgment stating that Defendant's actions (as summarized in Paragraphs 71, 74, 77 and 80) amount to deliberate indifference to Plaintiff's serious medical condition and violated, and continues to violate, Plaintiff's right to be free from cruel and unusual punishment as proscribed by the Eighth Amendment to the United States Constitution.

2. Issue an injunction ordering Defendant to:

   A. Immediately refer Plaintiff to a hepatologist to properly assess Plaintiff's present state of liver damage and Hepatitis C infection.

   B. Immediately provide for full doses of pegylated interferon to be administered to the Plaintiff as prescribed by the hepatologist.

   C. Arrange for bi-weekly (twice per month) appointments with the hepatologist during treatment.

   D. Regularly monitor Plaintiff's blood chemistry during treatment so the hepatologist can determine if adjustments or other drugs (i.e., Neupogen for decreased white blood cells, Neumega for decreased platelets, etc.) are necessary for the Plaintiff to continue with his treatment regimen.

E.  Provide for maintenance doses of pegylated interferon (90 mcg. of alpha-2a) to be administered to the Plaintiff for an indefinite period, as prescribed by the hepatologist, if the Plaintiff does not achieve a sustained virological response to full doses of pegylated interferon after a full course of treatment (at least 48 weeks).

F.  Refund to the Plaintiff in full the sum of $350.00 (the filing fee for this complaint).

3.  Decide this case in an expedited manner because of the life or death nature of the Plaintiff's medical condition.

4.  Upon granting relief to the Plaintiff, this case should remain open for continued monitoring to ensure enforcement of the aforementioned injunction because of the Defendant's propensity to circumvent court orders.

5.  Issue any other relief this Court deems appropriate under the facts and circumstances of this case.

I declare under penalty of perjury (pursuant to 28 U.S.C. § 1746) that the foregoing is true and correct.

Executed on this **5th** day of **December, 2007.**

Respectfully submitted,

MICHAEL JAMES KLOPF, pro se
Register No. 26218-004
Federal Correctional Institution
P.O. Box 1000
Loretto  PA  15940

**-16-**

# EXHIBIT A

RESPONSE TO REQUEST FOR ADMINISTRATIVE REMEDY NO. 389316-F1

This response concerns your Request for Administrative Remedy which we received on September 20, 2005. You question the discontinuation of your Hepatitis C treatment. You are requesting "to remain on Peg Interferon/Ribavirin and a prompt consultation with a Mayo GI for a qualified opinion on my treatment regimen."

A review of this matter reveals that a baseline HCV RNA test was completed on January 13, 2004, while you were at FDC Miami. A repeat baseline test was not medically necessary after your arrival at this facility prior to initiation of treatment.

The HCV RNA drawn at FDC Miami indicated that the minimum quantitative value was 700,000, with no way to predict how much higher it actually was. A lab analyzer can only read a result to a certain cutoff, and there are no reference standards for results higher than the cutoff. As you pointed out, the quantitative value must show a two log decrease over a 12 week period in order to continue treatment. Your viral load would need to be approximately 7000, indicating a positive response to treatment, but it was greater than 300,000. Additionally, your platelet count had been consistently decreasing since treatment was started. This has been an issue of concern shared by GI specialists that treated you at FDC Miami, FCI Loretto, and at FMC Rochester. There were several medical factors taken into account besides your viral load result in determining discontinuation of treatment.

Your physician appropriately discontinued your Hepatitis C treatment based on Bureau of Prisons Clinical Practice Guidelines.

Based on our findings, your Request for Administrative Remedy is denied. If you are dissatisfied with this response, you may file an appeal with the North Central Regional Director, Federal Bureau of Prisons, North Central Regional Office, Gateway Complex Tower II, 8th Floor, 4th & State Avenue, Kansas City, KS 66101, within 20 (twenty) calendar days of the date of this response.

_____
Marty C. Anderson
Warden

10/7/05
_____
Date

07 2246
**FILED**
DEC 1 3 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*Type or use ball-point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

| From: | KLOPF, MICHAEL J. | 26218-004 | 10 - 2 | FMC ROCHESTER |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A– INMATE REQUEST**

    I am presently undergoing PegInterferon/Ribavirin treatment for the Hepatitis C virus. My primary care physician, Ronald Ilvedson, informed me that he will be discontinuing my treatment because I am not responding to it. Contradictorily, I am showing an overwhelmingly positive response.

    Pursuant to the Federal Bureau of Prisons' CLINICAL PRACTICE GUIDELINES FOR THE PREVENTION AND TREATMENT OF VIRAL HEPATITIS, prior to the commencement of treatment, a baseline NAT for HCV RNA must be ordered to measure my viral load. However, Ilvedson failed to order the test. When I was incarcerated at FDC Miami, a similar test was performed in February of 2004. The problem is, the lab that quantified the test did not ascertain my specific viral load. The test result simply said that my viral load was "greater than 700,000." Because my actual viral load has never been deter-

### (SEE ATTACHMENT)

| 9-14-05 | *Michael J. Klopf* |
|---|---|
| DATE | SIGNATURE OF REQUESTER |

*Rec'd 9-20-05*

**Part B– RESPONSE**

*See attached.*

| 10/7/05 | *[signature]* |
|---|---|
| DATE | WARDEN OR REGIONAL DIRECTOR |

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL: RETURN TO INMATE      CASE NUMBER: 389316-F1

CASE NUMBER: _____

**Part C– RECEIPT**

Return to: _____
    LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

| DATE | RECIPIENT'S SIGNATURE (STAFF MEMBER) | BP-229(13) APRIL 1982 |
|---|---|---|

USP LVN    Printed on Recycled Paper

## ATTACHMENT

mined, Ilvedson stated: "We must assume that it was 700,000."
This assumption is based on neither science nor medicine.

My currant viral load is just 65,000. If 700,000 were the
true starting point, a drop to 65,000 is not a two log suppres-
sion from baseline, which is required to continue treatment. But
because mine is a Genotype 3 virus, it is associated with a high
viral load (See attached report of Dr. John B. Gross, Jr., Gas-
troenterologist (GI) at the Mayo Clinic). The range for a high
viral load is 5,000,000 to 25,000,000 (See attached article from
HEPATITIS magazine).

Based on the aforementioned facts, my pre-treatment viral
load was profusely greater than 700,000. Quite probably, it was
more than twenty times greater. Consequently, the treatment has
been a roaring success thus far. Furthermore, this has been ac-
complished with just half doses of PegInterferon (90 mcg). The
Mayo GI recommended full doses of PegInterferon. But this recom-
mendation was overruled by Michael B. Nelson, Chief of Health
Programs, Federal Bureau of Prisons.

Would my viral load suppression have been greater if full
doses of PegInterferon were administered from the very beginning?
Certainly. Am I responding to half doses? Yes. But the re-
sponse is more gradual because of the extreme baseline level.

Unfortunately, we will never know what my baseline viral load
was because Ilvedson "fumbled the ball" by failing to order the
test. Additionally, and also pursuant to the BOP's CLINICAL
PRACTICE GUIDELINES, it is stated: "Use the same laboratory and
same type of NAT when comparing pre[-]treatment and post-treat-
ment levels of HCV RNA." Clearly, this mandate was not followed.

I have 22 weeks of PegInterferon/Ribavirin treatment remain-
ing. I am experiencing no adverse side effects. In fact, I can-
not tell that I am on any type of medication whatsoever. I feel
like a million bucks. But because I have compensated cirrhosis,
to discontinue treatment at this point, based on nothing more than
illogical conjecture, would effectively amount to a death sentence.

In an attempt to informally resolve this matter, I calmly ex-
plained to Ilvedson the fatuity of his reasoning. Ilvedson re-
fused to discuss it, reiterated that he will discontinue treat-
ment and immediately transfer me, and ordered me out of his office.

I request to remain on PegInterferon/Ribavirin and a prompt
consultation with a Mayo GI for a qualified opinion on my treat-
ment regimen. Again pursuant to the BOP's CLINICAL PRACTICE
GUIDELINES, it is stated: "Inmates with chronic Hepatitis C and
compensated cirrhosis should be treated in consultation with a
physican specialist ..."



**6-218-968   28-Dec-2004**

**Mr. Michael J. Klopf**

**Gastroenterology Outreach**

**Supervisory**

Printed: 4-Jan-2005 8:10 by User ID: 10096400                                                          Page 1 of 1

**DEMOGRAPHIC INFORMATION:**

   Clinic Number: 6-218-968

   Patient Name: Mr. Michael J. Klopf

   Age: 45 Y

   Note Date: 28-Dec-2004

   Provider: John B. Gross, Jr., MD Pager: 4-7651

   Birthdate: 11-Nov-1959  Sex: M

   Address: Federal Medical Center, 26218-004, P.O. Box 4000  City: Rochester, MN 55903-4000

   History Section: OUTR # 2  Service: GI-OS  Type/Desc: SUP  Status: Fnl  Revision #: 1

   Facility: Federal Medical Ctr (Non-Mayo) (FMC)

**BILLING:**

   Margin Code: NC  Total Time:    Counseling Time:

**CHIEF COMPLAINT/PURPOSE OF VISIT:**

   ASSISTED BY: Dr. Roman Perri (127-08477).

   Supervisory note for Dr. Roman Perri in the GI Clinic at FMC.

**IMPRESSION/REPORT/PLAN:**

   Mr. Klopf is sent for advice about hepatitis C. He has genotype 3 infection with a high viral load, and what looks
to be nearly normal liver function despite the presence of early portal hypertension and hypersplenism. Cirrhosis
was confirmed with a biopsy earlier this year. I agree with documentation provided in Dr. Roman Perri's note of
December 28, 2004.

   We have recommended that Mr. Klopf consider treatment with peg interferon and ribavirin, provided the
interferon does not diminish the platelet count too much. If it drops below 40,000, we would decrease the
interferon dose by one-third. If it drops below 25,000, he should stop therapy. Because his genotype 3 infection is
associated with a high viral load and advanced liver fibrosis, we would recommend one year of therapy if possible.

Original: JBG:hp

Electronically Signed: Jan-4-2005 07:53 by J.B. Gross, Jr., MD



# By the Numbers

## Understanding your lab results can help make dealing with your illness easier.

BY MARC S. BOTTS

As if the sometimes ravaging effects of hepatitis C weren't enough for patients to deal with, they get frequent reminders of how confounding the disease is whenever they try to make heads or tails out of the lab results they receive during treatment. While understanding what all the numbers mean might not make HCV go away, breaking them down may make it easier to live with.

### ALT

Alanine aminotransferase, or ALT, says Brenda Chene, senior clinical research coordinator at the University of Louisville Liver Research Center, gives doctors an indication that something is going on in the liver because it's actually a byproduct of the cells being injured.

"It is the most specific marker we have for inflammation in the liver. Most enzymes in the body are found in different places. ALT is as well, but it is more specific to the liver than any of the other enzymes," Chene said. "So if you have something that is producing inflammation in your liver, your ALT will increase. That's because as the inflammation breaks down and kills the liver cells, the ALT level could rise."

### AST

Like ALT, aspartate aminotransferase (AST) is a marker for liver inflammation. Elevated ALT and AST levels generally are the first clues for doctors that HCV could be present. While ALT and AST levels will likely be a patient's first foray into the HCV numbers game, they certainly won't be the last. Biopsy scores, serum albumin and bilirubin levels, prothrombin times, viral loads and genotypes will undoubtedly occupy their thoughts—and fears.

That, says Pat Buchanan, is one of the things that makes HCV such a difficult disease to educate people about. "I think when you are first diagnosed, the numbers mean a lot because you're concerned because everything is elevated," said Buchanan, co-facilitator of LiverHope, an HCV advocacy and support group based in Minnetonka, Minn. "However, in realistic terms, the numbers in hep C actually mean little to nothing because you can have really elevated enzymes and have little damage or vice versa. Newly diagnosed people look at the numbers from test results and automatically imagine the worst, especially if they come back with a viral load that is 20 million or some other obscene number. They just panic because with most diseases, the higher the viral load, the worse you are—like in HIV," she said. "That's not the case with hep C, and educating people to that fact is difficult. This disease is weird, simply because the numbers don't mean much, and it takes time for people to understand that."

### More lab numbers

It isn't until an HCV patient's liver actually is in bad shape that the lab numbers start to become significant. That's not to say such things as viral load, genotype and biopsy scores should be ignored.

Viral load, which measures how much of the virus is actually in a specific sampling of the blood, can be quite low, say 200,000 parts or less, to quite high, more than 25 million. But since the results can vary depending upon which lab quantifies it, and it doesn't appear to have a direct bearing on the success of treatment, the viral load is not that significant.

Genotypes represent the 11 subgroups of HCV. Types 1, 2 and 3 are

### Say What?

HCV patients are confronted with laboratory test results that can be both confusing and frightening. Below is a basic explanation of the main liver function tests.

**ALT**—Alanine aminotransferase. An enzyme that appears in liver cells, with lesser amounts in the kidneys, heart and skeletal muscles, and is a relatively specific indicator of acute liver cell damage. Normal ALT levels are less than 48 UL.

**AST**—Aspartate aminotransferase. One of the two main liver function blood serum tests. This blood test aids detection and differential diagnosis of acute hepatic disease and monitors patient progress and prognosis in hepatic diseases. Normal AST levels are less than 42 UL.

**Serum Bilirubin**—The main bile pigment in humans, which, when elevated, causes the yellow discoloration of the skin and eyes known as jaundice. Serum bilirubin is generally considered a true test of liver function, since it reflects the liver's ability to take up, process and secrete bilirubin into the bile.

**Prothrombin Time**—A test that is used to assess blood clotting. Blood clotting factors are proteins made by the liver. When the liver is significantly injured, these proteins are not normally produced. Prothrombin time is usually expressed in seconds and compared to a normal control patient's blood.

**Serum Albumin**—A major protein formed by the liver. Chronic liver disease causes a decrease in the amount of albumin produced. Therefore, in liver disease, the level of the serum albumin is reduced.

**Viral Load**—Amount of specific viruses in a given volume of blood. A viral load of 200,000 to 1 million is considered low; 1 to 5 million is medium; 5 to 25 million is high; 25 million and up is very high.

found in patients worldwide, but patients in the United States typically fall within these groups, which are further divided into categories a, b or c. It is believed that certain subgroups and categories are more resistant to treatment with interferon.

Biopsy scores tell pathologists about specific damage to the liver itself. Inflammation and scarring are measured Grade 1 through Grade 4, with increasing severity. Serum albumin and bilirubin levels and prothrombin times (see sidebar) are indicators of more severe liver damage but are not necessarily significant in the early stages of the disease. "Those don't really come into play, generally, until a person has advanced cirrhosis and the liver is actually starting to fail," Chene said. HEP

# EXHIBIT B

**U.S. Department of Justice**
**Federal Bureau of Prisons**
**North Central Regional Office**

**Regional Administrative Remedy Appeal**
**Part B - Response**

**Admin Remedy Number**: 389316-R1

This is in response to your Regional Administrative Remedy Appeal dated October 21, 2005, disputing the outcome of your Administrative Remedy. You indicate your condition of Hepatitis C warrants treatment, yet Health Services staff opted to discontinue your treatment with Interferon and Ribavirin. You dispute the rationales provided concerning their medical decisions. For relief, you request "a consultation with a Mayo GI and re-treatment for the Hepatitis C virus."

We have reviewed the documentation related to your appeal. Based on this review, we concur with the Warden's response. Your record reflects staff have performed the appropriate evaluations to determine the status of your illness. Their decisions are in compliance with the BOP's Clinical Practice Guidelines for Hepatitis and the BOP's Program Statement 6031.01, <u>Patient Care</u>. Given this, we shall defer all treatment decisions to the local level. We encourage you to request a medical appointment to review your concerns and your current treatment options.

Based on these findings, your Administrative Remedy Appeal is denied.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534. Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

_11/18/05_
Date

Michael K. Nalley, Regional Director

07 2246
**FILED**
DEC 1 3 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Federal Bureau of Prisons

---

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-DIR-9 including any attachments must be submitted with this appeal.

| From: | KLOPF, MICHAEL J. | 26218-004 | 10-2 | FMC ROCHESTER |
|---|---|---|---|---|
| | LAST NAME, FIRST, MIDDLE INITIAL | REG. NO. | UNIT | INSTITUTION |

**Part A—REASON FOR APPEAL**

    I was undergoing PegInterferon/Ribavirin treatment for the Hepatitis C virus. My primary care physician, Ronald Ilvedson, discontinued my treatment because he "concluded" that it was not working. Conversely, the treatment was working just fine.

    Pursuant to the Federal Bureau of Prisons' CLINICAL PRACTICE GUIDELINES FOR THE PREVENTION AND TREATMENT OF VIRAL HEPATITIS, prior to the commencement of treatment, a baseline NAT for HCV RNA must be ordered to measure my viral load. However, Ilvedson failed to order the test. When I was incarcerated at FDC Miami, a HCV RNA was drawn in January of 2004. The problem is, the lab that performed the test did not ascertain my specific viral load. The test result simply said that my viral load was "greater than 700,000." Because my pre-treatment viral load has never been determined, Ilvedson now states: "We must assume that it was 700,000." This assumption is based on neither science nor medicine.

(SEE ATTACHMENT)

| 10-21-05 | | _Michael J. Klopf_ |
|---|---|---|
| DATE | | SIGNATURE OF REQUESTER |

**Part B—RESPONSE**

OCT 27 2005

---

| | |
|---|---|
| DATE | REGIONAL DIRECTOR |

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE      CASE NUMBER: __389316-F1__ R

**Part C—RECEIPT**

    CASE NUMBER: __389316-F1__

Return to: _____

    LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

| USP LVN | DATE | Previous editions not usable | SIGNATURE, RECIPIENT OF REGIONAL APPEAL | BP-230(13) APRIL 1982 |

**ATTACHMENT**

In order for treatment to be deemed as "working," a two-log decrease from baseline must occur after 24 weeks of **full doses** of PegInterferon for someone with a Genotype 3 virus. If 700,000 were my true baseline, a decrease to 7,000 would be the target level. But because mine is a Genotype 3 virus, it is associated with a high viral load (See EXHIBIT 1: Report of Dr. John B. Gross, Jr., Gastroenterologist (GI) at the Mayo Clinic). The range for a high viral load is 5,000,000 to 25,000,000 (See EXHIBIT 2: Article from HEPATITIS magazine). Based on these facts, my pre-treatment viral load was profusely greater than 700,000. Quite probably, it was more than twenty times greater. Unfortunately, we will never know because Ilvedson "fumbled the ball" by failing to order the test.

On 9-7-05, a HCV RNA was drawn showing a result of just 65,830 (See EXHIBIT 3). One week later, on 9-14-05, another HCV RNA was drawn showing a result of 346,124 (See EXHIBIT 4). Haplessly, they are distinctly different tests (Compare). And in yet another gaffe by Ilvedson, he ordered **quant**itative tests, when, pursuant to the BOP's CLINICAL PRACTICE GUIDELINES, he should have ordered **qual**itative tests for an inmate with the Genotype 3 virus. Additionally, and also pursuant to the BOP's CLINICAL PRACTICE GUIDELINES, it is instructed: "Use the same laboratory and same type of NAT when comparing pre[-]treatment and post-treatment levels of HCV RNA." Clearly, this instruction was not followed. If and when this case goes to court, a Florida hepatologist will testify in my behalf that it is impossible for anyone's RNA to increase from 65,830 to 346,124 in one week while still on PegInterferon.

In the RESPONSE TO REQUEST FOR ADMINISTRATIVE REMEDY NO. 389316-F1 (enclosed), Warden Marty C. Anderson states: "A repeat baseline test was not medically necessary after your arrival at this facility prior to the initiation of treatment." The Florida hepatologist will testify that this is a thoroughly ill-advised statement. The previous test was administered one year & two months before my treatment began. An individual's viral load can easily skyrocket in this amount of time. The RESPONSE also states: "[T]he minimum quantitative value was 700,000, with no way to predict how much higher it actually was. A lab analyzer can only read a result to a certain cutoff, and there are no reference standards for results higher than the cutoff." This statement contradicts the Mayo Medical Laboratories' own test results (See also EXHIBIT 3 and EXHIBIT 4). The first test indicates an upper limit of 28,800,000. The second test indicates an upper limit of 7,692,310. Both upper limits are clearly higher than the 700,000 cutoff alleged in the RESPONSE. The RESPONSE further states: "[Y]our platelet count had been consistently decreasing since treatment was started ... [t]here were several medical factors taken into account besides your viral load result in determining discontinuation of treatment." This is yet another erroneous statement. My viral load response was the only excuse ever given to me. My platelet count is easily above the 25,000 discontinuation point prescribed by the Mayo GI.

The most important issue in the analysis of my treatment for Hepatitis C is the fact that, contrary to the GI's recommendation, I was only given **half doses** of Peg-Interferon. When I was informed that my treatment was being discontinued, I requested an immediate consultation with a Mayo GI. Not surprisingly, Ilvedson denied my request.

It is quite obvious that my treatment regimen was botched by Dr. Ilvedson. The entire reason I was referred to a Mayo GI in the first place was for a qualified opinion. I have what is called "compensated cirrhosis." Pursuant to the BOP's CLINICAL PRACTICE GUIDELINES, it is directed: "Inmates with chronic Hepatitis C and compensated cirrhosis should be treated in consultation with a physician specialist ..." Ilvedson, a dislicensed gynecologist, clearly is not qualified to make "life or death" decisions about complicated liver diseases. Furthermore, Ilvedson ignored the BOP's CLINICAL PRACTICE GUIDELINES every step of the way. Because my treatment was stopped on 9-21-05, re-treatment is the only option. Therefore, I request a consultation with a Mayo GI and re-treatment for the Hepatitis C virus.

**Gastroenterology Outreach**
**Supervisory**

**6-218-968  28-Dec-2004**
**Mr. Michael J. Klopf**

Printed: 4-Jan-2005 8:10 by User ID: 10096400                                      Page 1 of 1

**DEMOGRAPHIC INFORMATION:**
    Clinic Number: 6-218-968
    Patient Name: Mr. Michael J. Klopf
    Age: 45 Y
    Note Date: 28-Dec-2004
    Provider: John B. Gross, Jr., MD  Pager: 4-7651

    Birthdate: 11-Nov-1959  Sex: M
    Address: Federal Medical Center, 26218-004, P.O. Box 4000  City: Rochester, MN 55903-4000
    History Section: OUTR # 2  Service: GI-OS  Type/Desc: SUP  Status: Fnl  Revision #: 1
    Facility: Federal Medical Ctr (Non-Mayo) (FMC)

**BILLING:**
    Margin Code: NC  Total Time:      Counseling Time:

**CHIEF COMPLAINT/PURPOSE OF VISIT:**
    ASSISTED BY: Dr. Roman Perri (127-08477).

    Supervisory note for Dr. Roman Perri in the GI Clinic at FMC.

**IMPRESSION/REPORT/PLAN:**
    Mr. Klopf is sent for advice about hepatitis C. He has genotype 3 infection with a high viral load, and what looks
to be nearly normal liver function despite the presence of early portal hypertension and hypersplenism. Cirrhosis
was confirmed with a biopsy earlier this year. I agree with documentation provided in Dr. Roman Perri's note of
December 28, 2004.

    We have recommended that Mr. Klopf consider treatment with peg interferon and ribavirin, provided the
interferon does not diminish the platelet count too much. If it drops below 40,000, we would decrease the
interferon dose by one-third. If it drops below 25,000, he should stop therapy. Because his genotype 3 infection is
associated with a high viral load and advanced liver fibrosis, we would recommend one year of therapy if possible.

Original: JBG:hp
Electronically Signed: Jan-4-2005 07:53 by J.B. Gross, Jr., MD

## EXHIBIT 1



EXHIBIT 2

# By the Numbers

## Understanding your lab results can help make dealing with your illness easier.

BY MARC S. BOTTS

As if the sometimes ravaging effects of hepatitis C weren't enough for patients to deal with, they get frequent reminders of how confounding the disease is whenever they try to make heads or tails out of the lab results they receive during treatment. While understanding what all the numbers mean might not make HCV go away, breaking them down may make it easier to live with.

### ALT

Alanine aminotransferase, or ALT, says Brenda Chene, senior clinical research coordinator at the University of Louisville Liver Research Center, gives doctors an indication that something is going on in the liver because it's actually a byproduct of the cells being injured.

"It is the most specific marker we have for inflammation in the liver. Most enzymes in the body are found in different places. ALT is as well, but it is more specific to the liver than any of the other enzymes," Chene said. "So if you have something that is producing inflammation in your liver, your ALT will increase. That's because as the inflammation breaks down and kills the liver cells, the ALT level could rise."

### AST

Like ALT, aspartate aminotransferase (AST) is a marker for liver inflammation. Elevated ALT and AST levels generally are the first clues for doctors that HCV could be present. While ALT and AST levels will likely be a patient's first foray into the HCV numbers game, they certainly won't be the last. Biopsy scores, serum albumin and bilirubin levels, prothrombin times, viral loads and genotypes will undoubtedly occupy their thoughts—and fears.

That, says Pat Buchanan, is one of the things that makes HCV such a difficult disease to educate people about. "I think when you are first diagnosed, the numbers mean a lot because you're concerned because everything is elevated," said Buchanan, co-facilitator of LiverHope, an HCV advocacy and support group based in Minnetonka, Minn. "However, in realistic terms, the numbers in hep C actually mean little to nothing because you can have really elevated enzymes and have little damage or vice versa. Newly diagnosed people look at the numbers from test results and automatically imagine the worst, especially if they come back with a viral load that is 20 million or some other obscene number. They just panic because with most diseases, the higher the viral load, the worse you are—like in HIV," she said. "That's not the case with hep C, and educating people to that fact is difficult. This disease is weird, simply because the numbers don't mean much, and it takes time for people to understand that."

### More lab numbers

It isn't until an HCV patient's liver actually is in bad shape that the lab numbers start to become significant. That's not to say such things as viral load, genotype and biopsy scores should be ignored.

Viral load, which measures how much of the virus is actually in a specific sampling of the blood, can be quite low, say 200,000 parts or less, to quite high, more than 25 million. But since the results can vary depending upon which lab quantifies it, and it doesn't appear to have a direct bearing on the success of treatment, the viral load is not that significant.

Genotypes represent the 11 subgroups of HCV. Types 1, 2 and 3 are

### Say What?

HCV patients are confronted with laboratory test results that can be both confusing and frightening. Below is a basic explanation of the main liver function tests.

**ALT**—Alanine aminotransferase. An enzyme that appears in liver cells, with lesser amounts in the kidneys, heart and skeletal muscles, and is a relatively specific indicator of acute liver cell damage. Normal ALT levels are less than 48 UL.

**AST**—Aspartate aminotransferase. One of the two main liver function blood serum tests. This blood test aids detection and differential diagnosis of acute hepatic disease and monitors patient progress and prognosis in hepatic diseases. Normal AST levels are less than 42 UL.

**Serum Bilirubin**—The main bile pigment in humans, which, when elevated, causes the yellow discoloration of the skin and eyes known as jaundice. Serum bilirubin is generally considered a true test of liver function, since it reflects the liver's ability to take up, process and secrete bilirubin into the bile.

**Prothrombin Time**—A test that is used to assess blood clotting. Blood clotting factors are proteins made by the liver. When the liver is significantly injured, these proteins are not normally produced. Prothrombin time is usually expressed in seconds and compared to a normal control patient's blood.

**Serum Albumin**—A major protein formed by the liver. Chronic liver disease causes a decrease in the amount of albumin produced. Therefore, in liver disease, the level of the serum albumin is reduced.

**Viral load**—Amount of specific viruses in a given volume of blood. A viral load of 200,000 to 1 million is considered low; 1 to 5 million is medium; 5 to 25 million is high; 25 million and up is very high.

found in patients worldwide, but patients in the United States typically fall within these groups, which are further divided into categories a, b or c. It is believed that certain subgroups and categories are more resistant to treatment with interferon.

Biopsy scores tell pathologists about specific damage to the liver itself. Inflammation and scarring are measured Grade 1 through Grade 4, with increasing severity. Serum albumin and bilirubin levels and prothrombin times (see sidebar) are indicators of more severe liver damage but are not necessarily significant in the early stages of the disease. "Those don't really come into play, generally, until a person has advanced cirrhosis and the liver is actually starting to fail," Chene said. *HEP*

EXHIBIT 3



MAYO
**Mayo Medical Laboratories**

**Laboratory Service Report**

Mayo Clinic Dpt of Lab Med & Pathology
200 First Street SW
Rochester, Minnesota 55905
1-800-533-1710
CLIA# 24D0404292
Lab Director: Curtis A. Hanson, M.D.

Mayo Medical Laboratories New England
265 Ballardvale Street
Wilmington, MA 01887
1-800-533-1710
CLIA# 22D0072372
Lab Director: Lynn A. Cheryk, Ph.D.

| PATIENT NAME | MED REC # | | DOB | AGE | SEX | ACCESSION # |
|---|---|---|---|---|---|---|
| KLOPF, MICHAEL | 26218-004 | | 11/11/1959 | 45Y | M | Y3210248 |
| **ORDERING PHYSICIAN** | **CLIENT ACCESSION #** | | | | | **ACCOUNT #** |
| ILVEDSON,R | 2298-10 | | | | | C7009051 |
| Federal Medical Center<br>Attn: Lab-Daryl Aaberg<br>P O Box 4600<br>Rochester MN 55903-4600 | COLLECTION<br>DATE     TIME<br>09/07/05 06:00 A | SPECIMEN INFORMATION | | | | |

---

HCV RNA Detect/Quant, S                    REC'D  09/07/05 03:43 P          RPT'D  09/08/05 02:40 P

HCV RNA Detect/Quant, S                         65830                        IU/mL
    Test Note: "This test was developed and its performance characteristics
               determined by Laboratory Medicine and Pathology, Mayo Clinic
               Rochester. It has not been cleared or approved by the U.S.
               Food and Drug Administration."
    Dynamic Range of this test is 10-28,800,000 IU/mL.

Reviewed on this date
SEP 0 9 2005
by Ronald E. Ilvedson, M.D.
NC+

Building 10
SEP 0 9 2005



| PATIENT NAME | ACCESSION STATUS | COLLECTION DATE AND TIME |
|---|---|---|
| KLOPF, MICHAEL | COMPLETE | 09/07/05 06:00 A |

EXHIBIT 4



# MAYO
**Mayo Medical Laboratories**

**Laboratory Service Report**

Mayo Clinic Dpt of Lab Med & Pathology
200 First Street SW
Rochester, Minnesota 55905
1-800-533-1710
CLIA# 24D0404292
Lab Director: Curtis A. Hanson, M.D.

Mayo Medical Laboratories New England
265 Ballardvale Street
Wilmington, MA 01887
1-800-533-1710
CLIA# 22D0072372
Lab Director: Lynn A. Cheryk, Ph.D.

| PATIENT NAME | MED REC # | DOB | AGE | SEX | ACCESSION # |
|---|---|---|---|---|---|
| KLOPF, MICHAEL | 26218-004 | 11/11/1959 | 45Y | M | Y3234168 |

| ORDERING PHYSICIAN | CLIENT ACCESSION # | | | | ACCOUNT # |
|---|---|---|---|---|---|
| ILVEDSON,R | 1813-10 | | | | C7009051 |

| Federal Medical Center | COLLECTION DATE   TIME | SPECIMEN INFORMATION |
|---|---|---|
| Attn: Lab-Daryl Aaberg | 09/14/05 06:00 A | |
| P O Box 4600 | | |
| Rochester MN 55903-4600 | | |

---

HCV QN by bDNA, S                     REC'D  09/14/05 03:42 P         RPT'D  09/16/05 02:40 P

Specimen Source                          Serum
HCV QN by bDNA, S                        346124                        IU/mL
   Assay dynamic range is 615 IU/mL to 7,692,310 IU/mL.
   To convert IU/mL to copies/mL, multiply the IU/mL
   result by 5.2.

Reviewed on this date
SEP 2 0 2005
by Ronald E. Ilvedson, M.D.



Building 10

SEP 1 9 2005

COPY

| PATIENT NAME | ACCESSION STATUS | COLLECTION DATE AND TIME |
|---|---|---|
| KLOPF, MICHAEL | COMPLETE | 09/14/05 06:00 A |

# EXHIBIT C

**Administrative Remedy No. 389316-A1**
**Part B - Response**

This is in response to your Central Office Administrative Remedy Appeal in which you request re-treatment for hepatitis C, and regular consultations with a liver specialist. You claim that you were inappropriately monitored during your treatment at FMC Rochester, given only half the dose of pegylated interferon, and refused consultation with a liver specialist. You contend that you were tolerating treatment without side effects, however you attribute the failure of treatment to eradicate the virus as due to the lower dose of pegylated interferon. You state that your genotype (3) has an 80% cure rate, assuming a "competently administered treatment regimen (i.e., full doses of pegylated interferon and ribavirin).

Your medical records were reviewed. Your pegylated interferon dose was modified based on BOP guidelines and the drug manufacturer's recommendations. Your baseline platelet count was below 75,000, therefore a lower dose was appropriate. The typical platelet count value at which treatment is discontinued is 50,000, however your treating physician felt comfortable with using a slightly lower cutoff of 40,000. You were treated for six months at this dose. Six months is the accepted duration of treatment for genotype 3. Two different types of quantitative viral load tests were performed on different specimens obtained in September, 2005. Regardless of which value you look at, it can be accurately predicted that you would not have achieved a sustained viral response with a higher dose of interferon. Individuals who develop a sustained viral response to treatment will have a dramatic drop, usually to near undetectable, within the first four doses of pegylated interferon with ribavirin. It is also highly unlikely that your platelet count could have been sustained at a safe level with full dose interferon.

Although it is accepted practice to attempt treatment in individuals such as yourself who have compensated cirrhosis, the studies on treatment response in this group have not yet been published. The 80% "cure" rate actually represents the percentage of ideal patients enrolled by the pharmaceutical company for the clinical trials, who did not have detectable virus 6 months after completion of treatment. This statistic should not be construed as a "cure rate."

With regard to re-treatment, your most recent platelet count on November 17, 2005, was 36,000. A repeat test on December 14, 2005 was 44,000. The risk of spontaneous bleeding in your internal organs, joints, and brain increases significantly in the 20-25,000 range. Therefore administering interferon to you at this time would expose you to unwarranted risk.

Accordingly, we concur with the responses provided, and that the medical care you have received was appropriate. Your appeal is denied.

07 2246

**FILED**

DEC 1 3 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

_February 24, 2006_
Date

_Harrell Watts, Administrator_
National Inmate Appeals

Type or use ball-point pen.  If attachments are needed, submit four copies.  One copy each of the completed BP-DIR-9 and BP-DIR-10, including any attachments must be submitted with this appeal.

From: __**KLOPF, MICHAEL J.**__ ___**26218-004**___ ___**South 2**___ ___**FCI Loretto**___
          LAST NAME, FIRST, MIDDLE INITIAL       REG. NO.       UNIT       INSTITUTION

**Part A—REASON FOR APPEAL**

    I was undergoing PegInterferon/Ribavirin treatment for the Hepatitis C virus while at FMC Rochester.  My primary care physician, Ronald Ilvedson, discontinued my treatment because he "concluded" that it was not working.  Conversely, even though I was prescribed only **half** doses of PegInterferon, the treatment was working just fine.

    Pursuant to the BOP's CLINICAL PRACTICE GUIDELINES FOR THE PREVENTION AND TREATMENT OF VIRAL HEPATITIS:

                       **(SEE ATTACHMENT)**

___12-14-05___                                                                        
    DATE                                               SIGNATURE OF REQUESTER

**Part B—RESPONSE**



---

_____                   GENERAL COUNSEL
        DATE

ORIGINAL: RETURN TO INMATE               CASE NUMBER: ___389316-R A1___

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Part C—RECEIPT**
                                    CASE NUMBER: ___389316-R1___

Return to: _____ _____ _____ _____
              LAST NAME, FIRST, MIDDLE INITIAL       REG. NO.     UNIT     INSTITUTION
SUBJECT: _____

_____
      DATE                         SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

USP LVN                                                           BP-231(13)
                                                             APRIL 1982

**ATTACHMENT**

| **Dr. Ilvedson should have:** | **Dr. Ilvedson actually:** |
|---|---|
| Ordered a baseline NAT for HCV RNA prior to the commencement of treatment to measure my viral load. | Failed to order the test. But used a non-specific test, more than one year old, as an improper substitute. |
| Ordered **qual**itative tests for someone with a Genotype 3 virus (before, during, and after treatment). | Ordered **quant**itative tests, which are for those with the Genotype 1 virus (during treatment only). |
| Prescribed **full** doses of PegInterferon. | Prescribed **half** doses of PegInterferon. |
| Used the same laboratory and same type of NAT when comparing pre-treatment and post-treatment levels of HCV RNA. | Used different laboratories and different types of NAT. |
| Scheduled an appointment for me with a Mayo Clinic liver specialist before discontinuing my treatment because "Inmates with chronic Hepatitis C and compensated cirrhosis should be treated in consultation with a liver specialist." | Refused to allow me to see a liver specialist. |

The REGIONAL ADMINISTRATIVE REMEDY APPEAL RESPONSE states: "[Dr. Ilvedson's and the Warden's] decisions are in compliance with the BOP's Clinical Practice Guidelines for Hepatitis ...." ???!!! I attribute Dr. Ilvedson's continual gaffes to ineptitude (he is a dislicensed gynecologist). However, I attribute the responses by the Warden and (especially) the Regional Director to deliberate indifference.

When I demonstrated that the Warden's RESPONSE TO REQUEST FOR ADMINISTRATIVE REMEDY was entirely contrary to the facts (See REGIONAL ADMINISTRATIVE REMEDY APPEAL), the Regional Director backed off of making specific statements that could later be proved false. Because there is no medical or scientific evidence that supports the Regional Director's contention that my virus was properly treated, a generic denial was issued in the REGIONAL ADMINISTRATIVE REMEDY APPEAL RESPONSE. This denial is the epitome of bad faith.

I understand that Hepatitis C is now an epidemic in the BOP. And the BOP realizes that it is cost prohibitive to effectively treat every afflicted inmate. However, I, personally, will not be denied. If the BOP persists in turning a blind eye to the fact that my treatment has quite obviously been botched by Dr. Ilvedson, I will have no choice but to file a civil suit against the BOP in the U.S. District Court for the District of Columbia and enlist family and friends to mount a campaign with their respective U.S. Senators, Congressmen and media contacts.

I am presently at the very last stage (compensated cirrhosis) where treatment can still be administered. Moreover, my Genotype 3 virus has approximately an eighty percent (80%) cure rate. However, this cure rate is correspondent to a competently administered treatment regimen. If I do not soon undergo full and carefully monitored PegInterferon/Ribavirin treatment as originally recommended by the Mayo Clinic liver specialists, it will essentially amount to a death sentence. Therefore, I request re-treatment for the Hepatitis C virus and regular consultations with a liver specialist before, during and after treatment.

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

Michael J. Klopf

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888
(EXCEPT IN U.S. PLAINTIFF CASES)

Pro se (PA)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
# 26218-004

**DEFENDANTS**

BoP

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

A    Case: 1:07-cv-02246
Assigned To : Lamberth, Royce C.
Assign. Date : 12/13/2007
Description: Pro Se General Civil

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

□ 1 U.S. Government
   Plaintiff

□ 3 Federal Question
   (U.S. Government Not a Party)

☑ 2 U.S. Government
   Defendant

□ 4 Diversity
   (Indicate Citizenship of Parties
   in item III)

**III CITIZENS**
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | □ 1 | □ 1 | Incorporated or Principal Place of Business in This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**□ A. Antitrust**

□ 410 Antitrust

**□ B. Personal Injury/
Malpractice**

□ 310 Airplane
□ 315 Airplane Product Liability
□ 320 Assault, Libel & Slander
□ 330 Federal Employers Liability
□ 340 Marine
□ 345 Marine Product Liability
□ 350 Motor Vehicle
□ 355 Motor Vehicle Product Liability
□ 360 Other Personal Injury
□ 362 Medical Malpractice
□ 365 Product Liability
□ 368 Asbestos Product Liability

**□ C. Administrative Agency
Review**

□ 151 Medicare Act

**Social Security:**
□ 861 HIA (1395ff)
□ 862 Black Lung (923)
□ 863 DIWC/DIWW (405(g)
□ 864 SSID Title XVI
□ 865 RSI (405(g)

**Other Statutes**
□ 891 Agricultural Acts
□ 892 Economic Stabilization Act
□ 893 Environmental Matters
□ 894 Energy Allocation Act
□ 890 Other Statutory Actions (If
   Administrative Agency is Involved)

**□ D. Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

**□ E. General Civil (Other) OR ☑ F. Pro Se General Civil**

**Real Property**
□ 210 Land Condemnation
□ 220 Foreclosure
□ 230 Rent, Lease & Ejectment
□ 240 Torts to Land
□ 245 Tort Product Liability
□ 290 All Other Real Property

**Personal Property**
□ 370 Other Fraud
□ 371 Truth in Lending
□ 380 Other Personal Property Damage
□ 385 Property Damage Product Liability

**Bankruptcy**
□ 422 Appeal 28 USC 158
□ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
□ 535 Death Penalty
□ 540 Mandamus & Other
■ 550 Civil Rights
□ 555 Prison Condition

**Property Rights**
□ 820 Copyrights
□ 830 Patent
□ 840 Trademark

**Federal Tax Suits**
□ 870 Taxes (US plaintiff or
   defendant
□ 871 IRS-Third Party 26
   USC 7609

**Forfeiture/Penalty**
□ 610 Agriculture
□ 620 Other Food &Drug
□ 625 Drug Related Seizure of
   Property 21 USC 881
□ 630 Liquor Laws
□ 640 RR & Truck
□ 650 Airline Regs
□ 660 Occupational
   Safety/Health
□ 690 Other

**Other Statutes**
□ 400 State Reapportionment
□ 430 Banks & Banking
□ 450 Commerce/ICC
   Rates/etc.
□ 460 Deportation

□ 470 Racketeer Influenced & Corrupt
   Organizations
□ 480 Consumer Credit
□ 490 Cable/Satellite TV
□ 810 Selective Service
□ 850 Securities/Commodities/
   Exchange
□ 875 Customer Challenge 12 USC
   3410
□ 900 Appeal of fee determination
   under equal access to Justice
□ 950 Constitutionality of State
   Statutes
□ 890 Other Statutory Actions (if not
   administrative agency review or
   Privacy Act

(3)

| ☐ **G.** *Habeas Corpus/ 2255* | ☐ **H.** *Employment Discrimination* | ☐ **I.** *FOIA/PRIVACY ACT* | ☐ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ **K.** *Labor/ERISA (non-employment)* | ☐ **L.** *Other Civil Rights (non-employment)* | ☐ **M.** *Contract* | ☐ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

■ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multi district Litigation  ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

*42 usc 1983*

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    **DEMAND $**    Check YES only if demanded in complaint
**JURY DEMAND:** ☐ YES  ✓ NO

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  ☐ YES  ✓ NO    If yes, please complete related case form.

**DATE** *12.13.07*    SIGNATURE OF ATTORNEY OF RECORD  *NCD*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed *only* if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the *primary* cause of action found in your complaint. You may select only *one* category. You *must* also select *one* corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.